321-0604-WC, Kurt Montgomery, Appellant by Michael Block v. Illinois Workers' Compensation Comm'n, Caterpillar Logistics Service, Inc., Appalee by Michelle Lafayette. Okay, Mr. Block, you may proceed. Thank you very much, Your Honor, and good afternoon, Justices. May it please the Court, and Ms. Lafayette, this case comes before the Court on a Section 8A prospective care petition. It raises four questions of law for the Court. The first, at least three of them, I believe, are cases of first impression, and the fourth may or may not be, depending on your view. The one that may or may not be is the standard that the Commission used in deciding this case. Ever since I can remember, the standard for prospective treatment has always been reasonable and necessary, but in this case, the Commission used a interest of the petitioner standard, or as they said in their words, treatment better served, or best option for treatment. The second question of law is the effect of the Utilization Review Statute, Section 8.7I3, by its plain and ordinary meaning, on proposed care. There are a couple additional factoids with respect to this, and that is that the Utilization Review that the when the doctor gave her deposition, it was Dr. Rubino, we were all shocked to find out that she had never seen the Utilization Review before, hadn't authored it, hadn't used the codes, and really didn't even know what the ODGs, the Official Disability Guides. Well, let me ask you this. Didn't the report bear her signature? I don't believe. No, she hadn't seen it. She had some other notes that may have borne her signature, but the actual report itself that was written by Corvell, not by her, they plugged in the codes. Well, no, I think Council asked her if she had seen the report, Council asked Dr. Rubino, so pages 3 through 23 of the deposition, Council said, is that your signature on page 23? And she said yes. She also testified under oath she hadn't seen the report before. No, I think that's what the lady said. So, in addition, there are only three modalities she was asked to review, and that was epidural steroid injections, biofeedback, and acupuncture. And at the deposition, she approved of two of the three, which were the biofeedback and the acupuncture, and only disapproved of epidural steroid injections. The third question for the court is whether, is the authority of the Illinois Workers' Compensation Commission to remove a very qualified doctor from treatment of the claimant? And the fourth question is the authority of the Illinois Workers' Compensation Commission to require the treatment be with a doctor, which they use the word, from a major medical institution, effectively unlicensing all other doctors in the state to treat this patient for this condition, which I think is beyond their authority. In your, Mr. Block, in your 8A petition, what prospective medical did you request? The 8A petition was, I believe, a general petition, but by the evidence and by everything that went in evidence, clearly what was requested, Your Honor, was the life care plan that was authored by Myla Carrelson. And there was no objection to the life care plan going in evidence, or that being the subject of the hearing. But the commission denied the life care plan, did they not? They denied it as premature, even though all doctors who reviewed it approved it with an occasional comment. Well, so my question is, on the 8A, you're going in asking for prospective medical treatment, some type of prospective medical treatment. Had medical treatment been turned down by the Absolutely. Okay, so they turned it down. What did they turn down? They turned down modalities which had been prescribed by Drs. Zabiega and Kelly. Things like aqua therapy, integrated massage therapy, and integrated manual therapy, I think is what it's called. There were other various modalities. The reason why I'm asking the question is this decision, this opinion from the commission, talks about who can treat him, where he can be treated, but it never says what treatment he's supposed to get. Because it denied the petition for treatment, notwithstanding that we put into evidence. No, it denied the life plan. Yes, that is the treatment plan. Well, so they're dictating who can perform treatment, but they never say what treatment he's supposed to get. No, what they said is, we're going to deny this life care plan, and we want a different plan down the road, which is even worse. It's directly contrary to what their Section 12 said, which is the worst thing that can happen is you stop treatment. That's not what they said, Mr. Block. I have it right in front of me. The commission finds that petitioners' care and treatment shall be managed by one physician to oversee the care plan and direct all tangible modalities of treatment, necessary medication, on and on and on and on and on. They never said what treatment they were approving. Well, that's the problem with the award, Your Honor. They didn't approve anything, even though the life care plan which was offered was very specific as to the exact treatment which was sought. And it's, I mean, it's very specific. It's got the codes. It's got the frequency. I mean, this was a very difficult defendant, so we put in that life care plan literally everything. So all that had to happen and what should happen is a life care plan should be awarded because they had a chance for a Section 12 exam and their Section 12 examiner said, overall, the life care plan is appropriate. The only thing he disapproved of in the life care plan was acupuncture, which was approved of by the Utilization Review Doctor as the only thing affecting the autonomic nervous system. The only thing they said about the life care plan was they found that the plan proposed by Carlson is premature and should not be considered until a medical care plan is implemented pursuant to this order. That's exactly the problem, Your Honor. We presented a very appropriate medical care plan to be implemented and they denied the plan. They said, we're going to switch doctors first instead, which is wrong. They don't have that authority and they're going to say, you go to a major medical institution and said, they don't have that authority, but they denied the plan. Mr. Black, can we get back to a special question? You're arguing that Section 8.7 I-3 prohibited the respondent and the commission from rejecting the life care plan, correct? Isn't that your argument? Okay, yeah, that is one of the arguments we're making. I'm happy to delve into that. Doesn't the section that you're talking about by its terms apply to the employer, not to the commission? How are you reading that as applying to the commission? Because the commission needs authority to act. Nothing in the act gives the commission the authority to deny a plan when the statute clearly says it shouldn't be denied at all, even by the employer. The special question is, does it even apply? Does that statutory language apply to the commission? That's your first threshold hurdle you've got to get over. Judge, respectfully, I don't believe that's a hurdle because what the commission does is it enforces what the law is that the party is supposed to do with temporary total disability compensation. They're supposed to pay within 14 days. If they don't, the commission can order it to pay. I understand you're extrapolating, but you started out your argument, I believe, acknowledging that this may be a case of first impression. So I take it you have no cases or other authority you can direct this to that says it applies to the commission, correct? Well, I believe there's other provisions in the act that are basically self-executing by the parties, such as temporary total disability. And when they don't self-execute, the commission enforces those petitions provisions. Mr. Block, let me get a little more basic here. Okay. You settled this case on contracts and medical was left out. Is that correct? Yes, sir. So now your client wants certain medical treatment and the respondent says, no, I'm not paying that. So you go to the commission and you ask for an order on the commission that they pay for certain prospective medical treatment. Is that correct? Yes. Am I correct so far? Yes. And that's what you did? Yes. So now that my question is, the commission never said what treatment he was supposed to get. They only said who has to administer the treatment. No, they also denied the, they denied the petition for medical care. That's a denial. No, they said that the life care plan was premature. So at that point in time, shouldn't you have been asking the commission for certain specific treatment, do this, give this operation, give us this treatment, et cetera, and so on, and let them rule on the treatment type by type. They didn't do that. He gets medical treatment, but it's got to be performed by Dr. X and Y at the university of such and such. Judge, I'll do respect. I strongly disagree. We asked for treatment. We asked for a treatment plan. It was denied because they wanted someone else to do the treatment. I don't know what else any petitioner can do. I mean, the workers' compensation act to a degree is supposed to be official. Mr. Block, slow down. Yes, sir. They didn't deny it. They said that it's premature and should be considered until a medical plan is implemented pursuant to this order. So I'm asking you, what plan did they implement? Are you supposed to implement? Well, there's two different issues, Judge. The statute itself talks about treatment. That's what you present to the commission. You can certainly say that it's a treatment proposed by Dr. A or Dr. B, but what you present to the commission under the statute is the treatment. At that point, and again, this is a temporary benefits hearing. The whole concept of the statute is it's supposed to be an expedited hearing, which 19B is, and you're supposed to get a fast result. It's supposed to be an efficient statute. What the commission is doing, what the defendant is doing is the exact antithesis of that. We did everything we could to propose specific treatment and a specific plan. Every treatment was itemized, coded, scheduled. And what the commission said is, we're not going to authorize your treatment because we're going to do something we're not authorized to do, which is send you to a different doctor, send you to a major medical institution. And that's a denial, Judge. I don't know how else you can say it. Mr. Block, read the decision. They didn't say they denied it. They said it was premature. So if it's premature, what treatment is supposed to happen before they'll address the issue of this life plan? Judge, all due respect, they denied the current proposed treatment plan. They did say it was premature, but they still denied the plan when the claimant asked for treatment. The statute says they're supposed to move on. Would you show me, Mr. Block? But they're asking about a completely different plan. Mr. Block, show me in the decision where it said the plan is denied. Tell me one paragraph. It's not there, Mr. Block. You don't have to look too hard. No, Judge, it is there. It says it's denied as premature. Where's the word denied, Mr. Block? Mr. Block, be candid with the court when we ask you a question. Where does it say it's denied? Okay, let me... It's in paragraph four on page two. Right. It says the commission finds that the life care plan is premature and should not be considered until a medical care plan is implemented pursuant to this order. They're asking for a different medical care plan, Judge. They're not... Like I say, if what you're asking is true... Mr. Block, what I'm trying to explain to you is if you read this thing, they never prescribed a plan. The only thing they said is who has to treat him. Yes. And that's your argument that they had no authority to do that. Judge, that's part of the argument. But further argument is that when you say we will consider a different plan, that is in effect denying this plan. I don't know how much stronger it can be, Judge. It's a temporary benefits hearing. They're not giving temporary benefits. This is directly contrary to the purpose of the statute. I don't see, to be honest, how you could see it otherwise, Judge. I understand what you're talking about on the language, but what they are doing is denying the plan. Mr. Block, you've only got a few more minutes left on your argument. What about your argument that the commission was without the authority to impose a central managing position? It had to be quick because the red light just went on. OK, well, I mean, they even wanted the central managing doctor to manage his gastrointestinal issues. It's a major ask of any doctor. But clearly, Your Honor, there is no authority in the act for it. The only thing the defense relies on is a reasonable and necessary statute. And if you look at the Bob Red remodeling case or you look at the Rockford clutch case, they're both on point. They say it's the petitioner's call as long as a qualified doctor proposes a reasonable plan. And everybody that saw this plan said it was a good plan. They might have had tweaks, but they all said it was a good plan. It should have been implemented. What you're suggesting, Justice Hoffman, I think is directly contrary to the whole purpose of the statute. Why are we here if it's not to give people that? Well, we're back to the same issue now. Block, I'll have to cut you off at this time. You will have time in reply. Thank you, Judge. Uh, Miss Lafayette, you may respond. Thank you. If it would please the court, Mr. Mr. Black, just to sort of pick up on where the court was going with this is the first thing that sticks out to me is whether or not the commission is bound by that section 8.73. And we address this in our brief and our conclusion or what we ask the court to reach the conclusion is that they are not. And if you look at the other statutory language of 8.7, it talks about how the commission is to consider utilization review evidence in the context of all the evidence. It's not given a stronger position, a weaker position, or a position that the commission is bound by when they go through the evidence. And the commission starts from that perspective when they look at the facts in this case, um, which then gets into what Justice Hoffman has been talking about, which is what plan or what treatment was the commission ordering or wanting my client caterpillar to pay for. And what I think the commission was struggling with is what should that future treatment look like. The life care plan is really, I mean, it's a $15 million plan when you, when you look at it, that throws everything but the proverbial kitchen sink into it. It's even based on the commission's decision here and their order here, that treatment for radiculopathies that aren't even work-related included. But where the commission comes back to is one of the things Dr. Stanton-Hicks and one of the things Dr. Gruft over the course of care had talked about, which is having one physician manage and put together a plan of treatment for Mr. Montgomery. And that stems from the fact that Dr. Kelly, which the commission excludes, um, really has done more harm than good in this instance. And he's done more harm than good because all he's done is prescribed opioid medications at increasing dosages. And Dr. Stanton-Hicks. Well, yeah, let me ask you a question. When someone goes before the commission on 8A and is seeking prospective medical treatment, it's the treatment that the commission approves after the treatment is done or whatever treatment he gets at that particular point in time. If you refuse to pay it, you refuse to pay it on the basis it wasn't reasonable and it wasn't necessary. So how I'm at a loss to understand where the commission gets the authority to dictate what doctor is to perform these treatments and where it's to be performed. They have a right to say you're entitled to prospective treatment in the form of X operation, but they have no right to tell a claimant who's to perform that operation. Nor do they have a right. They have no authority to tell the claimant where that operation is to be performed. But that's exactly what they did. Where did that authority come from? What section of the act? I don't know that you can necessarily look to a specific section of the act, but you can look to sections 8A itself, which talks about the respondents only liable for reasonable, necessary, and quadruly related medical treatment. No doubt about that. And if the commission orders a certain type of treatment and the claimant goes and gets treatment, you can come back and say, I'm not paying for that because it was neither reasonable nor necessary. And you're going to get a hearing on that when he comes back with another 8A petition. But how in heaven's name would you ever enforce this thing? You got to go to the certain doctor or hospital and you don't get paid? Well, the way I've interpreted it, what my client is to do under this is the parties are to agree on the central treater. They can't agree on the central treater, then that issue has to come back before the commission. And there's actually a subsequent 8A petition currently pending on those issues, subject to whatever happens here, because the commission has deferred that pending this appeal. And then at that point, you may have questions of what's appropriate, what's not appropriate. But I think the commission's just looking for a generalized plan that they can then adopt in this case, because the life care plan, as they note, is premature. And I think it's premature, one, because it's not coming from the doctors as to this is what you should do step by step. And you've got Dr. Kelly involved here, too, who is prescribing these opioid medications, which is then hindering what the other doctors have recommended. I mean, you've got Dr. Stanton-Hicks. Plus, I can run through the whole list of them, Dr. Sano, Stokes, Feeley, Lubenow, Gorski, Roland, Lynch, and Gruff, who say that those are medications that need to be discontinued, yet they're included in the life care plan. Well, Ms. Lafayette, perhaps there was some good motivation here on behalf of the commission. But again, I take it you can direct us to no specific statutory or case law authority that specifically says the commission had the right to do that. Is that correct? As far as a case or a specific statutory provision, I would agree with you. Yeah, that would be correct, Justice. As a case of first impression, then? Could you tell me what the finality of this order is? If the two of you were supposed to go back and agree on something later? What was the finality in this order? I mean, other than in the denial of certain benefits and the denial of penalties. But the question is, if the only thing the commission is saying, are you to go back and figure out what the plan is? But oh, by the way, it's got to be done by this doctor, that doctor, or at the university. Where's the finality here? You know, I think the finality is in the sense that they have identified a specific step that the parties are to now take, that they want implemented. And what would that step be? That step is identifying the central treater and then getting the plan of care that the central treater would recommend. And that's not coming out of left field to designate a central treater. There's evidence to support the need for a central treater. That comes from Dr. Stanton-Hicks recommendation. And it comes from Dr. Grubb's recommendations too. So our reviewable issue is whether that order dictating a central supervisor, like a Trump master over Mar-a-Lago, right? Something like that. And that's really the issue that's on review is whether that is authorized under the act. I would actually argue that it doesn't rise to the level of whether they have the authority to do that. It's whether or not the designation of a central treater in this instance is something that's reasonable and necessary. And the commission has looked through all of the medical evidence here and identified that the one central theme that the physicians they found to be credible, Dr. Grubb, Dr. Stanton-Hicks, and a lot of the other doctors I've listed, which is that these doctors, when they want to do an interdisciplinary plan of care, want to identify one doctor that's directing the treatment. And the one thing those doctors really want to direct is the prescription medications. Because if they can't oversee the prescription medications, they can't move the treatment forward. The other stuff does no good when you're not addressing what is the underlying problem with this gentleman at this point. And that is the opioid dependence. Can I ask you another question? This paragraph 1B interests me. It's the last sentence. However, the commission orders that the central treater must be either from Cleveland Clinic or from an accredited university-based center in the Chicago area, such as Northwestern Memorial Hospital, Rice University, Chicago, Loyola, or from an accredited university based in Arizona, where the petitioner currently lives. So evidently, according to the commission, this guy can't be treated in any state other than Illinois or Arizona, or Cleveland Clinic, I suppose, in Ohio. I mean, that would be one way to interpret it. I don't know that that would be. If he moved to, let's say, Florida or California or Washington state, I don't think it would necessarily be reasonable to say you're locked in with treaters in these facilities. I think our next contention would be that you have to look at some accredited university based system where he's residing at that point in time. Now, what does the act specifically say that the claimant is proceeding under? It says that he's seeking prospective medical care. Is that correct? Well, in theory, yes. He was seeking prospective medical care. OK. I would argue that he was seeking prospective medical care in the life care plan to take away any defenses we had at long term as to what could be reasonable and necessary. And I think the commission recognized that. Because if you award just this kitchen sink of the life care plan, what happens if, you know, six years from now, medical science develops and there's a better treatment modality out there? Or there's something else that could be considered in place of that that might be more cost effective, might be a better option for him. The commission, I think, didn't want to be locked in with that, you know, 15 million dollar life care plan at that point in time. So they they dialed it back and they said, OK, what can we say as far as prospective medical care right now might be reasonable and necessary? And the first thing that has to happen is actually identifying what that care is. So they want a central physician that will do that because otherwise you just get I mean, you see how many different facilities this gentleman has been with since the 1990s. And each time he moves from a facility, it's really comes down to the fact that it's the opioid dependence issue. And the more recent physicians are all saying we need to address that issue with the exception of the doctor they excluded, Dr. Kelly, and they've excluded Dr. Kelly because the treatment being offered by Dr. Kelly is not reasonable and necessary. That's inherent in their decision. And Dr. Kelly's recommendations for this continued opioid medication is completely contrary to what all the other physicians have recommended. And when you get to the cases that counsel cited for the proposition that petitioner's decision just have to be reasonable or rational, the threshold issue in those cases was really never had to be addressed, which was whether or not the treatment the doctors were recommending was reasonable and necessary. Here, the commission is saying it wasn't what Dr. Kelly's doing wasn't reasonable and necessary. To just prescribe opioids and just continuously increase the dosage makes no sense. And you can look to Dr. Groth's notes. This is at 4467 of volume two of the act, where he even talks about we agree with Stanton Hicks regarding tapering of his benzodiazepines and replacing them with stress management via psychological counseling. And then he goes on. We never suggested that this patient stop his medications. We plan to better manage his pain medications and to modify and perhaps taper the amount of short-acting opioids. We also would have suggested alternatives to being on a benzodiazepine, a couple of other drugs, which have deteriorous effects on memory. And then they go on and talk about Dr. Groth goes on to talk about what he wanted to do with the medications moving forward. And the barrier to that was Dr. Kelly. Because even when he tried to talk to me. Can I ask you a question, Ms. Lafayette? Oh, sure. Then shouldn't what the commission have done was defined that the treatment that had been afforded to the petitioner by Dr. Kelly was neither reasonable, nor was it necessary. And you don't have to pay for it. Right. They didn't do that. Now, they said all these things about Dr. Kelly, but they never said this treatment wasn't reasonable, it wasn't necessary, and that you didn't have to pay for it. The question that I had when I read this decision is who in heaven's name wrote it. Yeah, I mean, you know, this is the second time we've been before this panel with this with this order, and you've seen the second order because Mr. Black and I, you know, after going before the commission on a number of occasions had to work out the incurred medical, and we reached an agreement to do that in order to make that portion of the order at least final and enforceable against parties. But I think inherent in the commission's decision was even though they didn't use the buzzwords, and it would have been nice if they had used the buzzwords, but you can read it into their decision and reasonably do so is that the treatment being recommended by Dr. Kelly was neither reasonable, nor necessary. You could even take a step further and maybe they were looking at section 19 D of the act the injurious practice portions of it, and saying what he was doing was more causing more harm than good. At that point in time, which the commission has the authority under that section to cut off the treatment to, and what they've effectively done here is cut off the treatment with Dr. Kelly, cut off the treatment, because they said, I don't want to misquote it here so let me find it. What do they do. Isn't it, I'll make it simple. Here's how they cut off the treatment. Yeah, under the act. And that is the employer doesn't have to pay for it. Right. Yeah. So that's the. I mean, I don't think the commission should be at almost from 30,000 feet looks like the I mean, where's lawyering now, you represent the person who, who is supposed to pay for you say no, it's not reasonable and necessary we don't have to pay for it. Meaning, are you talking about my client, just know I'm talking about the issue, you can defend against the payment by saying it's not reasonable and necessary. Certainly, but here because there's worse. You have to look at it in the context of the fact that there was also incurred medical they were considering with this. They were, you know, cutting it off on certain things but then they were looking for what should that perspective care look like. And the only way to get a reasonable plan somewhere is to say okay, go have a central treat or draw it up for us. If I could ask you a point of question. Based on what you're asking us to do if we were to uphold the decision. Isn't there some concern about in future cases whenever similar case comes along the commission's going to start picking the treating physician for the claimant. Isn't there some concern about that. I not necessarily I think this case presents a unique set of facts and circumstances that we don't see all that often because of the underlying opioid issues and you're asking us to put the stamp of approval on them picking the position. We're asking you to put the stamp of approval on them designating a central treater to come up with a plan of care, this could arise in the future again. It could arguably could yes. It'll turn into a managed care situation by the commission. The only thing that I can figure out that they actually authorized and ordered in this decision was that you have to pay for treatment and attendant care for necessary and related gastro intestinal issues. They ordered that. Yes, they did. Then in the next paragraph, which is really that bills for necessary and related treatment attendant care and travel are to be directed for approval and payment by the respondent. You got to approve it before they can get the treatment. And then they go on and they say that the respondents should bring necessary related medical expenses under 8a. We were always obligated to do that. You didn't need the commission to say that you were obligated to do it under the act and medical was left open. That's why I keep asking the question, who drafted this thing? Either Commissioner Devran, Luskin or Lamborn. I mean, that would be my I don't believe that Mr. Blunt, the attorney handling it for Caterpillar at the time is responsible for the order or just what we ought to do is vacate this thing and send it back and tell them to rule treatment by treatment, whether they're approving it as prospective medical care, leaving after the treatment for a determination of whether what was done is reasonable and necessary. I mean, this thing is what are we supposed to do with this thing? I'm at a loss. This is the worst. Any other questions from the court? I think it's the worst decision I have read in almost 20 years on this panel. Okay, very good. No other questions. Mr. Block, you may reply. Uh, thank you. And I might say in terms of the worst decisions, the saddest part is Mr. Montgomery is the one that's suffering for this. And again, in fairness to Mr. Montgomery, there's a suggestion that there's this huge opioid dependence and that Dr. Kelly is the amounts he's taking that go back to like 2010. In addition to being prescribed by Dr. Kelly, they were prescribed by Dr. Zabiega because there was a period of time in the middle where Dr. Zabiega opened a Joliet office where my client lived and he travels like the rolling meadows to go see Dr. Kelly. So he went to a different doctor. They were both colleagues, but not partners or associates or anything at a prior pain clinic. And they both prescribed the same amount of medications. And if you look at page 12 of our brief, Dr. Zabiega went into great detail to tell how each of the medications was appropriate. And this wasn't really Dr. Kelly's plan. Originally it wasn't Dr. Zabiega's plan. It was the Loyola plan. It was Caterpillars referred to medical group, a major medical institution who said, yes, he should be on opioids. And yes, he should be on benzodiazepines because they were treating CRPS. They were also treating depression, anxiety, and all the things that go along with it because it's a very painful condition. As a matter of fact, Dr. Rubino in her deposition at page 31 said the RSD is now throughout his body. I mean, it's a very sad case when the commission doesn't do its job and he has to the thing about whether to remand it or just approve the life care plan is when they don't do their job. Let's look at what the life care plan did. It prescribed medications he's been on since 2010. That should be his choice. There's no evidence he's suffering any of the effects of addiction. And Dr. Kelly happens to be a former associate professor at Northwestern University, an addiction specialist and an interventional pain management specialist. He's very well qualified to do this kind of thing. And he sees it as did Dr. Zabiega, as did the lay witness, Mr. Javi, I think his name is, is being very helpful to him. And he's obviously adjusted to it and he's working well with it. In terms of the complaints on Myla Carlson's life care plan, it was written by Dr. Zabiega. It was not written by Dr. Kelly. I mean, and as far as the treatments, as far as the medications go, Dr. Gruff in his notes described the medications as moderate. So this assumption that there's this horrible amount of medications, it is opioids, it is benzodiazepines, but it's something he's been doing since 2010 successfully. I'm going to ask a question somewhat related. Are we here? Is it the Ms. Lafayette was saying this is a $15 million plan, right? Well, yes and no. If you go at retail cost, it is, if you go at fee schedule, it isn't, if you go at what you can actually negotiate, it will be significantly less. And the other thing is to be honest, I'm not sure Mr. Montgomery or anybody could do all the things the plan says, but it's an option where he can do if needed. And if the doctors prescribe it, and I think no one has questioned, but the Dr. Kelly and Dr. are prescribing what's in the patient's best interest. And they think it's these medications, other doctors disagree to an amount. And Dr. Stanton Hicks didn't say get off the opioids. He said taper. There's a big difference between taper and weaning. And he recognized that. So opioid medication is continuing. It's a matter of degree, but the plan itself, Dr. Stanton Hicks approved it. Dr. Gruff approved it. Dr. Zabiega approved it. Dr. Kelly approved it. No doctor disapproved it. And I don't think that it's fair to the claimant that he should wait anymore. So that's why I'm suggesting, I don't think we need a remand. Mr. Montgomery did everything he's supposed to do to present his evidence to the commission. And Justice Hoffman, I kind of agree with you. I think we got garbage back and it's very unfortunate. But the fact is, when a claimant comes in and says, I need this treatment, here's my specific plan. And they say, come back a different day with a different plan. That's a denial. And I think it should be treated as such. Okay. Any questions from the court? No. Hearing none. Thank you, counsel, both for your arguments in this matter this afternoon.